## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| WEST SHORE HOME, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>BRYAN CHAPMAN,<br><br>*Defendant.* | Civil Action No. |

## <u>VERIFIED COMPLAINT</u>

Plaintiff West Shore Home, LLC ("West Shore") files this verified complaint against defendant Bryan Chapman and shows as follows:

## <u>NATURE OF THE ACTION</u>

1.     West Shore hired Defendant Bryan Chapman on January 18, 2023, as Vice President of Supply Chain.  This role gave Chapman access to a wealth of confidential business information and trade secrets belonging to West Shore.

2.     West Shore terminated Chapman for cause on August 25, 2023.  Soon after his termination, Chapman revealed that he had misappropriated and misused West Shore's confidential business information and trade secrets, thereby: (a) breaching his contractual obligations to stop using, and to return and delete, West

Shore's confidential business information and trade secrets; and (b) violating federal and state law governing the misappropriation of trade secrets.

3.    Chapman then attempted to extort West Shore by threatening to disclose West Shore's confidential information and trade secrets, and to disseminate false information about West Shore to its business partners, Confidential Vendor 2 referenced below (a West Shore competitor through the vendor's network of dealers), and the public.  He also actually disclosed false information to that competitor.  As to disclosing false information, Chapman stated to West Shore, "This is going to be a big black eye on America's Most Admired Home [] Improvement Company."

4.    Chapman also demonstrated repeatedly since his termination that he will not cease his illegal conduct, or return West Shore's confidential information or trade secrets, unless compelled to do so by a Court order, stating to West Shore's counsel, "I may not be able to win a legal battle with West Shore Home, but I can make sure we both lose in the eye of the public."  Thus, West Shore files this action seeking legal and equitable relief for Chapman's willful misappropriation of trade secrets and confidential information committed by Chapman in violation of federal law and state law, and for breaching his contractual obligations owed to West Shore. Further, given that West Shore does not know the full extent of Chapman's unlawful disclosures and uses of West Shore's confidential information and trade secrets

(including the "Confidential Information and Trade Secrets" defined below), or the damages he caused, West Shore will seek and is entitled to expedited discovery so that it can fully assess and attempt to remedy the damages Chapman caused regardless of whether the law requires West Shore to attempt to do so.

## PARTIES

5.    Plaintiff West Shore is a limited liability company, organized under the laws of Pennsylvania, with its corporate headquarters in Mechanicsburg, Pennsylvania.

6.    Defendant Bryan Chapman is an adult individual who, upon information and belief, resides in Ashland, Missouri.

## JURISDICTION AND VENUE

7.    This action includes claims for violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831 *et seq.* ("DTSA").  Accordingly, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action arises under the law of the United States. *See also* 18 U.S.C. § 1836(c) (granting United States District Courts original jurisdiction over private claims for violations of the DTSA).

8.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims asserted herein because the state law claims are so related

to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.    Chapman consented to personal jurisdiction in this judicial district when he entered into a valid employment agreement ("Agreement") with West Shore.  A true and correct copy of the Agreement is attached hereto as **Exhibit 1**. The Agreement contains a mandatory forum selection clause setting the United States District Court for the Middle District of Pennsylvania as the venue for disputes arising out of the Agreement in the event of diverse citizenship or a federal question of law. (Ex. 1 at § 7(i).)

10.    Venue is proper in the United States District Court for the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims in this action occurred in this judicial district. Venue is also proper here because the mandatory forum selection clause contained in Chapman's employment agreement sets this Court as the venue for claims arising out of federal law, such as those contained herein. (Ex. 1 at § 7(i).)

## FACTS COMMON TO ALL COUNTS

**A.    West Shore's Business**

11.    West Shore is one of the fastest growing home remodeling companies in the United States.  Over the past decade, West Shore has experienced tremendous growth, with approximately 37 locations in 17 states, including Pennsylvania.  West

Shore provides wet area bathroom remodeling services as well as window and door replacement services to residential customers.

12.    The home remodeling industry in which West Shore competes is a highly competitive marketplace with many companies offering similar services and vying for business from the same group of customers and securing necessary products from the same pool of suppliers.  West Shore vigorously competes for scarce resources, investing significant time, money, and effort into developing and maintaining its vendor relationships.  The pervasive and continuing supply chain disruptions resulting from the COVID-19 pandemic magnified the importance of West Shore's vendor relationships – relationships that continue to this day and upon which West Shore depends to succeed.  Thus, any disruption to West Shore's relationship with its vendors, suppliers, and other business partners would have a significant impact on West Shore's business and profits.

13.    Accordingly, West Shore considers information regarding its vendor relationships, procurement strategies for sourcing materials, strategic plans to improve its supply chain, and materials pricing and utilization information to be highly confidential, sensitive, and trade secret, and treats such information with the care and secrecy that it deserves.

**B.      Chapman's Employment with West Shore**

14.     West Shore hired Chapman on January 18, 2023.  As a condition to his employment, Chapman executed an employment agreement.  On March 20, 2023, for good consideration, Chapman executed his Agreement.  (Ex. 1.)

15.     During his employment, Chapman served as Vice President of Supply Chain.  In this high-ranking position, Chapman was responsible for overseeing critical supply chain and highly confidential aspects for high volume core materials and products utilized in daily installations in all service areas throughout the country, including strategic purchasing, logistics and inventory management, maintaining, proprietary strategic initiatives, procuring strategic vendor selections and relationships, and accurate forecasting and analysis of vendor performance.

16.     As Vice President of Supply Chain, Chapman had access to West Shore's valuable, confidential, proprietary, and/or trade secret information, which included, but was not limited to: vendor information; vendor capacities; vendor contracts; vendor pricing; strategies for sourcing products and components; strategies for supply chain optimization; product development; product testing; product performance; product pricing, costs, and margins; purchasing trends; inventory positions; warehousing plans and strategies; utilization rates for materials; logistics operations and strategies; real estate strategies relative to supply chain initiatives; critical company projects; technology initiatives; regional operations data

and information; inside operations data and information; level loading process; financial planning and analysis; proprietary PDCA data and information; market research; installation policies and procedures; training programs and materials; and expansion plans and strategies (collectively the "Confidential Information and Trade Secrets").

17.     As Vice President of Supply Chain, Chapman regularly attended and participated in private company meetings and phone calls, attended by only those employees who needed to know, where West Shore's Confidential Information and Trade Secrets were discussed.  Chapman maintained a notebook in which he took notes during these meetings reflecting Confidential Information and Trade Secrets.

18.     In recognition of his access to such West Shore's Confidential Information and Trade Secrets, Chapman executed the Agreement, which included non-solicitation and confidentiality obligations.  The Agreement states:

> Confidential Information; Samples and Other Materials. […] Employee further acknowledges and agrees that by virtue of Employee's employment with WSH, Employee will have access to, and has been entrusted with and will be entrusted with, Confidential Information, and that WSH and its affiliates would suffer great loss and injury if Employee would disclose this information or use it in a manner not specifically authorized by WSH. Therefore, Employee agrees that during the period in which the Employee is employed by WSH and for three (3) years thereafter, Employee will not, directly or indirectly, either individually or as an employee, agent, partner, shareholder, owner, trustee, beneficiary, member, manager, co-venturer, distributor, consultant, contractor, or in any other capacity, use or disclose or cause to be used or disclosed any Confidential Information.

<u>Return of Confidential Information and other WSH Property</u>. Employee agrees to return to WSH immediately upon termination of Employee's employment under this Agreement any and all copies of Confidential Information in Employee's possession or control, whether in hard copy, electronic, or any other form, and all other property of WSH in Employee's possession.

<u>Non-Solicitation</u>. During (i) Employee's employment with WSH and (ii) for a period of twenty-four (24) months from the date that Employee's employment with WSH terminates for any reason (the "Restricted Period"), Employee shall not directly or indirectly: (i) facilitate, induce or attempt to induce any employee of WSH to leave the employ of WSH, or in any way interfere with the relationship between WSH and any employee thereof; (ii) hire or contract for services from any person who was an employee of WSH at any time during Employee's employment with WSH; (iii) encourage any customer, potential customer, contractor, consultant, vendor, or supplier to terminate their relationship with WSH or otherwise interfere with the relationship between any customer, contractor, consultant, vendor, or supplier and WSH; […]

(Ex. 1 at §§ 5(b), 6(a)–(b).)

19.    The Agreement also states:

Employee acknowledges and agrees that irreparable injury to WSH may result in the event Employee breaches any covenant or agreement contained in Sections 5 or 6 [non-solicitation and confidentiality] and that the remedy at law for the breach of any such covenant will be inadequate. Employee agrees that WSH shall be entitled, in addition to such other remedies and damages as may be available to it by law or under this Agreement, to seek injunctive relief to enforce the provisions of Sections 5 and 6.

(Id. at § 7(b).)

**C.    Chapman's Misconduct Leads to His Termination**

20.    In mid-August 2023, Chapman's supervisor requested that Chapman work to identify alternate suppliers and manufacturers for a few, select products as a redundancy measure. The common course of action to accomplish such a request would entail privately reaching out to a vendor on an individual basis, gauging the vendor's potential fit and interest, and asking the vendor to execute a non-disclosure agreement ("NDA") prior to further, in-depth discussions.

21.    Instead, Chapman drafted a one-page "Request for Information" and submitted it to at least 25 vendors without first vetting whether the vendors sold or manufactured the desired products, whether West Shore or its current suppliers had pre-existing contracts with each vendor, or whether the vendor supplied a competitor of West Shore, and without requesting that an NDA be signed. Chapman thus disclosed material information regarding West Shore's confidential supply chain objectives without vetting the suitability of the recipients or considering their actual or potential relationships with existing West Shore suppliers or competitors.

22.    Moreover, although West Shore only needed redundancy with respect to certain products, Chapman in the Request for Information instead misstated that West Shore was seeking suppliers of acrylics and/or plastics, as well as other products. This statement was incorrect and contrary to West Shore's actual needs and objectives.

23.    As a result of Chapman's indiscriminate mass-mailed Request for Information and the misstated scope of West Shore's request, various pre-existing West Shore business partners believed their contracts and/or relationships with West Shore were in peril.  At least one business partner, Confidential Vendor 1, reached out and questioned West Shore's motivations for sending the Request for Information.  Consequently, West Shore was forced to initiate damage control measures to stabilize its business relationships and business reputation.

24.    Confidential Vendor 1 was not on Chapman's initial distribution list but received the Request for Information from a third party.  After Confidential Vendor 1 received the document, Confidential Vendor 1 contacted West Shore out of concern for its business relationship with West Shore, and West Shore had to assure Confidential Vendor 1 that its business relationship was not in peril and that it was not looking to circumvent its obligations.

25.    As a consequence of these actions and other misconduct, such as Chapman's failure to participate in meetings related to a significant West Shore project where he was to be engaged as a subject matter expert and providing false information to members of the West Shore executive team regarding important product decisions, West Shore terminated Chapman on August 25, 2023.

26.    West Shore provided a termination letter to Chapman demanding that he return all West Shore property immediately, including all West Shore

information, company documents, notebooks, training materials, tools, electronic devices, and all other West Shore property in his possession. The termination letter also instructed Chapman to delete and destroy all unreturned West Shore Confidential Information and Trade Secrets in his possession and to send confirmation of the same by 4:30 pm ET on Saturday, August 26, 2023. Chapman never sent any such confirmation, and he never turned over any information, documents, or material, including the notebook in which he took notes during private West Shore meetings. Finally, the termination letter reminded Chapman that the confidentiality and non-solicitation obligations under his Agreement survived his termination.

27.    Chapman, in correspondence to West Shore's counsel, stated that he believes that whatever third party sent the Request for Information to Confidential Vendor 1 is responsible for his termination. This is not the case. It is Chapman alone who is responsible for his own termination.

**D.     Chapman's Misconduct Escalates Post-Termination, Causing Damage to West Shore's Business Relationships and Demonstrating Chapman's Misappropriation of West Shore's Confidential Information and Trade Secrets**

28.     On August 31, 2023, Chapman sent an email to West Shore, referencing photos he claimed to have reflecting West Shore equipment, notes he took in his notebook during private West Shore meetings discussing West Shore's Confidential Information and Trade Secrets, and referencing other confidential information that Chapman apparently continues to possess despite his contractual obligation to have returned, deleted, and stopped using such information.  To make matters worse, Chapman threatened to disclose Confidential Information and Trade Secrets and to disseminate false allegations about West Shore unless West Shore gave him a severance package.  Among other things, Chapman specifically threatened to allege, falsely, that West Shore misappropriated the intellectual property of one of West Shore's vendors in the form of a product design belonging to that vendor.

29.     Chapman's threats were not limited to West Shore.     On September 15, 2023, Chapman sent an email to West Shore business partner, Confidential Vendor 1, attaching the Request for Information that led, in large part, to his termination, and demanding to know who originally provided the Request for Information to Confidential Vendor 1.  Confidential Vendor 1 did not reply to Chapman according to Confidential Vendor 1.

30.    On September 19, 2023, Chapman followed up his September 15 email to Confidential Vendor 1 with another email to threaten, "OK, we will do it the hard way through the court system."  Confidential Vendor 1 then informed West Shore that it had been receiving threatening emails from Chapman.

31.    On September 21, 2023, West Shore, through counsel, sent a demand that Chapman cease and desist breaching the Agreement, including using West Shore's Confidential Information and Trade Secrets.  A true and correct copy of that letter is attached here as **Exhibit 2**.  The letter laid out Chapman's misconduct and breaches of his Agreement known at that time.  The letter also demanded that Chapman cease communicating with West Shore business partners, customers, contractors, consultants, vendors, or suppliers in violation of his Agreement; that he identify, isolate, sequester, preserve, and stop using West Shore's Confidential Information and Trade Secrets and identify to whom he had transmitted such confidential information; and confirm in writing that he would comply with his confidentiality and non-solicitation obligations in his Agreement by September 25, 2023.  The letter also demanded that Chapman produce to West Shore all West Shore Confidential Information and Trade Secrets in his possession, including the photographs referenced in his August 31, 2023, email and any notebooks containing West Shore information.  To date, Chapman has provided no documents, photographs, notebook, or any confirmation that he has ceased his illegal

activities and complied with his Agreement.  Instead, Chapman remains steadfast in his threats to retain, use, and disseminate West Shore's Confidential Information and Trade Secrets if he is not paid.  Chapman likewise continues his threats to spread false allegations throughout the industry and the public regarding West Shore.

32.    In fact, it now appears that Chapman has already made good on his threat to defame West Shore.  Sometime after Chapman's termination from West Shore, Chapman reached out first via LinkedIn and then via telephone to yet another West Shore business partner, Confidential Vendor 2.  During this phone conversation, Chapman falsely stated that West Shore had copied a vendor's product design (which West Shore has not) and he asked Confidential Vendor 2 what they were going to do about it.  During this phone call, Chapman may have also disclosed West Shore's Confidential Information and Trade Secrets.

33.    Presumably as a result of this conversation with Chapman, Confidential Vendor 2 sent West Shore a formal notice of a 5% price increase on September 23, 2023.

34.    On September 24, 2023, Chapman responded to West Shore's cease and desist letter.  Rather than comply with West Shore's enumerated demands, Chapman stated that, "The only way I'm going away is with six months of severance pay from West Shore Home."  He also stated, "I may not be able to win a legal battle with West Shore Home, but I can make sure we both lose in the eye of the public."

35.    On September 28, 2023, Chapman responded yet again to West Shore's cease and desist letter.  Again, rather than comply with West Shore's enumerated demands, Chapman instead attached a document that he apparently drafted after his termination which confirms that he possesses and continues to misuse West Shore's Confidential Information and Trade Secrets.  The document also contains numerous material inaccuracies based on his misinterpretations and possession of such information.

36.    Since his termination, Chapman has:  admitted to retaining West Shore's Confidential Information and Trade Secrets in violation of his Agreement; attempted to extort West Shore by threatening to disclose West Shore's Confidential Information and Trade Secrets and disseminating false allegations about West Shore business practices, which are untrue and would cause significant damage to West Shore's reputation; revealed West Shore's Confidential Information and Trade Secrets by re-sending the Request for Information to Confidential Vendor 1 after his termination; harassed and threatened West Shore business partners including Confidential Vendor 1 and Confidential Vendor 2; and defamed West Shore to Confidential Vendor 2 by making false allegations about West Shore copying a vendor's product design, and likely revealing West Shore's Confidential Information and Trade Secrets, simply to malign West Shore in the eyes of a business

partner and competitor, and on information and belief, leading to a price increase by Confidential Vendor 2 directed at West Shore and thus harming West Shore.

37.    Chapman has made clear through his repeated threats and lack of cooperation that he will not cease his misconduct and violations of his Agreement and the law without being enjoined by this Court, and he will continue to use or disclose West Shore's Confidential Information and Trade Secrets causing irreparable harm to West Shore.

38.    All conditions precedent to the maintenance of this lawsuit have been fulfilled.

**COUNT I**
**Misappropriation of Trade Secrets**
**Violation of Defend Trade Secrets Act of 2016**
**(18 U.S.C. §§ 1831 *et seq.*)**

39.    West Shore realleges and incorporates into this count each and every allegation set forth above.

40.    As set forth above, in the course of his employment with West Shore, Chapman was privy to West Shore's Confidential Information and Trade Secrets, including, but not limited to: vendor information; vendor capacities; vendor contracts; vendor pricing; strategies for sourcing products and components; strategies for supply chain optimization; product development; product testing; product performance; product pricing, costs, and margins; purchasing trends; inventory positions; warehousing plans and strategies; utilization rates for materials;

logistics operations and strategies; real estate strategies relative to supply chain initiatives; critical company projects; technology initiatives; regional operations data and information; inside operations data and information; level loading process; financial planning and analysis; proprietary PDCA data and information; market research; installation policies and procedures; training programs and materials; and expansion plans and strategies.

41.    West Shore's Confidential Information and Trade Secrets constitute "trade secrets" under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1831 *et seq*. ("DTSA") because it is information that derives independent economic value to West Shore from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use. 18 U.S.C. § 1839(3).

42.    West Shore has taken reasonable steps to keep this information secret and to ensure its confidentiality.  West Shore maintains the confidentiality of such information and the secrecy of its trade secrets by making West Shore's Confidential Information and Trade Secrets available only to West Shore employees who need to know such information to carry out their employment duties and who must enter a password to access such information maintained electronically.  West Shore utilizes non-solicitation and confidentiality agreements (such as the Agreement Chapman executed as a condition precedent of his employment) to protect this information and

to prevent unauthorized use and/or disclosure by employees and former employees. West Shore also prohibits employees from downloading this information to their personal devices or forwarding this information to personal or third-party email addresses. West Shore further requires all employees (including Chapman) to review and acknowledge, on an annual basis, West Shore's Employee Handbook, which requires employees to safeguard West Shore's Confidential Information and Trade Secrets.

43.    West Shore's Confidential Information and Trade Secrets are related to its products and services that are used in, or intended for use in, interstate commerce, as West Shore has approximately 36 locations in 17 states.

44.    West Shore has invested substantial time, effort, and money into the acquisition and further development of West Shore's Confidential Information and Trade Secrets.

45.    West Shore heavily relies on its Confidential Information and Trade Secrets for its success, as it is based on the information that powers its business operations and informs its future strategy, including information regarding its financials, targeted markets, customers, suppliers and vendors, product design, and marketing methods, strategies, and metrics. Such information would be immensely valuable to any competitor, which could use the information to replicate West Shore's success to-date and undermine its future strategic initiatives.

46.    Chapman became aware of and had access to West Shore's Confidential Information and Trade Secrets solely by virtue of his employment with West Shore.  Chapman knew, or should have known, that this information belonged solely to West Shore.

47.    At no time did West Shore give Chapman permission to remove, use, or disclose the Confidential Information and Trade Secrets for his own benefit or for the benefit of any third party.

48.    To the contrary, Chapman was specifically prohibited from removing, using, or disclosing this information, as detailed in his Agreement and the West Shore Employee Handbook.

49.    Chapman admitted to misappropriating West Shore's Confidential Information and Trade Secrets through improper means when, on August 31, 2023, he emailed West Shore and stated he retained West Shore's Confidential Information and Trade Secrets after his termination, including through photographs and his notebook, despite his obligation to immediately return and destroy any such information in his possession upon his termination and despite West Shore's several post-termination demands that he do so.

50.    Chapman has already disclosed West Shore's Confidential Information and Trade Secrets when, on September 15, 2023, he sent an email to Confidential

Vendor 1 attaching the Request for Information that gives insight into West Shore's business and operational strategies.

51.    Chapman has also made several threats to both West Shore and West Shore's counsel that he will continue to disclose West Shore's Confidential Information and Trade Secrets, along with false information about West Shore's business, if West Shore does not pay him a severance package.

52.    Given the above, there is a sufficient likelihood and substantial threat that Chapman has used and/or disclosed, and will continue to use and/or disclose, West Shore's Confidential Information and Trade Secrets.

53.    Chapman has expressed to West Shore's counsel that the only way he is "going away" is if West Shore cedes to his extortionate demands and pays him six months of severance pay.  He has proven to be undeterred by his contractual and legal obligations to not use or disclose West Shore's Confidential Information and Trade Secrets.  Therefore, injunctive relief is necessary and appropriate to keep him from continuing his misconduct.  West Shore has no adequate remedy at law.

54.    Such use and/or disclosure by Chapman has already harmed West Shore by damaging relationships with several of its business partners, including with Confidential Vendor 1 and Confidential Vendor 2.  It has also harmed West Shore in the 5% price increase that, on information and belief, Confidential Vendor 2 has applied to its contracts with West Shore.

55.    Such use and/or disclosure by Chapman will cause substantial and irreparable harm to West Shore by placing West Shore at a competitive disadvantage and by causing West Shore to lose business and incur increased costs through unfair and improper use of its Confidential Information and Trade Secrets.

56.    Chapman's misappropriation of West Shore's Confidential Information and Trade Secrets will continue to cause substantial harm to West Shore by placing its competitors at an unfair advantage through the ability to exploit West Shore's Confidential Information and Trade Secrets if disclosed.

57.    As a direct and proximate result of Chapman's conduct, West Shore has suffered, and will continue to suffer, substantial, but largely incalculable, financial loss.

58.    As a direct and proximate result of Chapman's actions, West Shore is entitled to full compensatory and consequential damages in an amount to be proven at trial and to include economic and compensatory damages. 18 U.S.C. § 1836(b)(3)(B).

59.    Chapman's actions have been willful and malicious.  By Chapman's own admissions, he is willing to use West Shore's Confidential Information and Trade Secrets to leverage a severance package for himself and to harm West Shore's business reputation.  Because Chapman's actions in violation of the DTSA have

been willful and malicious, West Shore is also entitled to an award of exemplary damages and reasonable attorneys' fees. 18 U.S.C. § 1836(b)(3)(C)-(D).

60.    West Shore therefore seeks a judgment against Chapman for actual, compensatory, consequential, and exemplary damages, preliminary and permanent injunctive relief, prejudgment interest, an award of costs and reasonable attorneys' fees, a disgorgement of any unjust enrichment to Chapman, all equitable relief compelling the return of West Shore's Confidential Information and Trade Secrets retained by Chapman after his termination, including any copies of such information, to West Shore, and such other relief as the Court deems just and proper.

**COUNT II**
**Misappropriation of Trade Secrets**
**Violation of Pennsylvania Uniform Trade Secret Act**
**(12 Pa. Cons. Stat. §§ 5301 *et seq.*)**

61.    West Shore realleges and incorporates into this count each and every allegation set forth above.

62.    As set forth above, in the course of his employment with West Shore, Chapman was privy to West Shore's Confidential Information and Trade Secrets, including, but not limited to: vendor information; vendor capacities; vendor contracts; vendor pricing; strategies for sourcing products and components; strategies for supply chain optimization; product development; product testing; product performance; product pricing, costs, and margins; purchasing trends; inventory positions; warehousing plans and strategies; utilization rates for materials;

logistics operations and strategies; real estate strategies relative to supply chain initiatives; critical company projects; technology initiatives; regional operations data and information; inside operations data and information; level loading process; financial planning and analysis; proprietary PDCA data and information; market research; installation policies and procedures; training programs and materials; and expansion plans and strategies.

63.    West Shore's Confidential Information and Trade Secrets constitute "trade secrets" under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. Cons. Stat. §§ 5301 *et seq*. ("PUTSA") because it is information that derives independent economic value to West Shore from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. 12 Pa. Cons. Stat. § 5302.

64.    West Shore has taken reasonable steps to keep this information secret and to ensure its confidentiality.  West Shore maintains the confidentiality of such information and the secrecy of its trade secrets by making West Shore's Confidential Information and Trade Secrets available only to West Shore employees who need to know such information to carry out their employment duties and who must enter a password to access such information maintained electronically.  West Shore utilizes non-solicitation and confidentiality agreements (such as the Agreement Chapman executed as a condition precedent of his employment) to protect this information and

to prevent unauthorized use and/or disclosure by employees and former employees. West Shore also prohibits employees from downloading this information to their personal devices or forwarding this information to personal or third-party email addresses. West Shore further requires all employees (including Chapman) to review and acknowledge, on an annual basis, West Shore's Employee Handbook, which requires employees to safeguard West Shore's Confidential Information and Trade Secrets.

65. West Shore has invested substantial time, effort, and money into the acquisition and further development of the West Shore's Confidential Information and Trade Secrets.

66. West Shore heavily relies on its Confidential Information and Trade Secrets for its success, as it is based on the information that powers its business operations and informs its future strategy, including information regarding its financials, targeted markets, customers, suppliers and vendors, product design, and marketing methods, strategies, and metrics. Such information would be immensely valuable to any competitor, which could use the information to replicate West Shore's success to-date and undermine its future strategic initiatives.

67. Chapman became aware of and had access to West Shore's Confidential Information and Trade Secrets solely by virtue of his employment with

West Shore.  Chapman knew, or should have known, that this information belonged solely to West Shore.

68.    At no time did West Shore give Chapman permission to remove, use, or disclose the Confidential Information and Trade Secrets for his own benefit or for the benefit of any third party.

69.    To the contrary, Chapman was specifically prohibited from removing, using, or disclosing this information, as detailed in his Agreement and the West Shore Employee Handbook.

70.    Chapman admitted to misappropriating West Shore's Confidential Information and Trade Secrets through improper means when, on August 31, 2023, he emailed West Shore and admitted to having retained West Shore's Confidential Information and Trade Secrets after his termination, including through photographs and his notebook, despite his obligation to immediate return and destroy any such information in his possession upon his termination and despite West Shore's several post-termination demands that he do so.

71.    Chapman has already disclosed West Shore's Confidential Information and Trade Secrets when, on September 15, 2023, he sent an email to Confidential Vendor 1 attaching the Request for Information that gives insight into West Shore's business and operational strategies.

72.     Chapman has also made several threats to both West Shore and West Shore's counsel that he will continue to use and disclose West Shore's Confidential Information and Trade Secrets, along with false information about West Shore's business, if West Shore does not pay him a severance package.

73.     Given the above, there is a sufficient likelihood and substantial threat that Chapman has used and/or disclosed, and will continue to use and/or disclose, West Shore's Confidential Information and Trade Secrets.

74.     Chapman has expressed to West Shore's counsel that the only way he is "going away" is if West Shore cedes to his extortionate demands and pays him six months of severance pay.  He has proven to be undeterred by his contractual and legal obligations to not use or disclose West Shore's Confidential Information and Trade Secrets.  Therefore, injunctive relief is necessary and appropriate to keep him from continuing his misconduct.  West Shore has no adequate remedy at law.

75.     Such use and/or disclosure by Chapman has already harmed West Shore in damaging relationships with several of its business partners, including with Confidential Vendor 1 and Confidential Vendor 2.  It has also harmed West Shore in the 5% price increase that, on information and belief, Confidential Vendor 2 has applied to its contracts with West Shore.

76.     Such use and/or disclosure by Chapman will cause substantial and irreparable harm to West Shore by placing West Shore at a competitive disadvantage

and by causing West Shore to lose business and incur increased costs through unfair and improper use of its Confidential Information and Trade Secrets.

77.    Chapman's misappropriation of West Shore's Confidential Information and Trade Secrets will cause substantial harm to West Shore by placing its competitors at an unfair advantage through the ability to exploit West Shore's Confidential Information and Trade Secrets if disclosed.

78.    As a direct and proximate result of Chapman's conduct, West Shore has suffered, and will continue to suffer, substantial, but largely incalculable, financial loss.

79.    As a direct and proximate result of Chapman's actions, West Shore is entitled to full compensatory and consequential damages. 12 Pa. Cons. Stat. § 5304(a).

80.    Chapman's actions have been willful and malicious.  By Chapman's own admissions, he is willing to use West Shore's Confidential Information and Trade Secrets to leverage a severance package for himself and to harm West Shore's business reputation.  Because Chapman's actions in violation of the PUTSA have been willful and malicious, West Shore is also entitled to an award of exemplary damages and reasonable attorneys' fees. 12 Pa. Cons. Stat. §§ 5304(b), 5305(3).

81.    West Shore therefore seeks a judgment against Chapman for actual, compensatory, consequential, and exemplary damages, preliminary and permanent

injunctive relief, prejudgment interest, an award of costs and reasonable attorneys'

fees, a disgorgement of any unjust enrichment to Chapman, all equitable relief

compelling the return of West Shore's Confidential Information and Trade Secrets

retained by Chapman after his termination, including any copies of such information,

to West Shore, and such other relief as the Court deems just and proper.

## COUNT III
### Breach of Contract

82.     West Shore realleges and incorporates into this count each and every

allegation set forth above.

83.     Chapman executed the Agreement, a valid and binding written contract.

84.     Under the terms of the Agreement, Chapman agreed and was obligated

not to, directly or indirectly, disclose, use, or cause to be used, West Shore's

Confidential Information and Trade Secrets. (Ex. 1 at § 6(a).)

85.     Under the terms of the Agreement, Chapman agreed and was obligated

to return to West Shore immediately upon his termination any and all copies of West

Shore's Confidential Information and Trade Secrets in his possession. (Ex. 1 at §

6(b).)

86.     Under the terms of the Agreement, Chapman agreed and was obligated

to refrain from, directly or indirectly, interfering with the relationship between any

customer, contractor, consultant, vendor, or supplier and West Shore. (Ex. 1 at §

5(b).)

87.    The terms of the post-termination covenants are reasonable in their scope and the provisions are necessary to protect West Shore's legitimate business interests.

88.    Chapman has breached and continues to breach the Agreement because he retained West Shore's Confidential Information and Trade Secrets post-termination, including photographs and his notebook, and has disclosed and threatened to use and/or disclose West Shore's Confidential Information and Trade Secrets.

89.    Additionally, Chapman has breached the Agreement by interfering with the relationship between West Shore and its vendors and suppliers by sending the Request to Information to Confidential Vendor 1 and by initiating a conversation with Confidential Vendor 2 and relaying false information that, on information and belief, led to a 5% price increase on West Shore's contract with Confidential Vendor 2.

90.    West Shore has been damaged by these material breaches of the Agreement because its Confidential Information and Trade Secrets have been misappropriated, because it has suffered damage to its business reputation, and because Chapman's wrongful conduct has, on information and belief, caused a 5% price increase by one of West Shore's business partners, Confidential Vendor 2.

91.    As the direct and proximate results of these material breaches by Chapman, West Shore has suffered, and will continue to suffer, damages in an amount to be determined at trial.

92.    Chapman agreed through his execution of the Agreement that West Shore would be irreparably injured if he breached his confidentiality and non-solicitation obligations, and that "the remedy at law for the breach of any such covenant will be inadequate." (Ex. 1 at § 7(b).)  Accordingly, West Shore seeks injunctive relief to enjoin Chapman from continuing his misconduct and irreparably harming West Shore.

93.    West Shore therefore seeks a judgment against Chapman for actual, compensatory, and consequential damages, preliminary and permanent injunctive relief, prejudgment interest, all equitable relief compelling the return of West Shore's Confidential Information and Trade Secrets retained by Chapman after his termination, including any copies of such information, to West Shore, and such other relief as the Court deems just and proper.

## COUNT IV
## Intentional Interference with Contractual Relationships

94.    West Shore realleges and incorporates into this count each and every allegation set forth above.

95.    West Shore maintains contractual relationships with its business partners, vendors, and suppliers.

96.    Specifically, West Shore and Confidential Vendor 1 have a contract to conduct business.   West Shore also has a contract to conduct business with Confidential Vendor 2.

97.    During his time as Vice President of Supply Chain with West Shore, Chapman was aware of these contracts generally and was specifically aware of West Shore's contracts with Confidential Vendor 1 and with Confidential Vendor 2.

98.    By having a post-termination phone call with Confidential Vendor 2 where Chapman made defamatory remarks and false allegations regarding West Shore and, on information and belief, divulged West Shore's Confidential Information and Trade Secrets, Chapman intentionally interfered with West Shore's contract with Confidential Vendor 2.

99.    By sending the September 15, 2023, and September 19, 2023, harassing and threatening emails to Confidential Vendor 1, Chapman intentionally interfered with West Shore's contract with Confidential Vendor 1.

100.   Chapman acted with the wrongful purpose of damaging West Shore's business relationships with Confidential Vendor 2 and with Confidential Vendor 1.

101.   Chapman was no longer an employee of West Shore when he intentionally interfered with these contracts, nor was he a competitor of West Shore. Accordingly, there is no justification or privilege that applies.

102.    As a direct and proximate result of Chapman's intentional interference, West Shore has been damaged in an amount to be determined at trial, including the loss of business reputation with its business partners Confidential Vendor 1 and Confidential Vendor 2, and in the 5% price increase that Confidential Vendor 2 applied, on information and belief, to only its contract with West Shore.

103.    Chapman has expressed to West Shore's counsel that the only way he is "going away" is if West Shore cedes to his extortionate demands and pays him six months of severance pay.  He has proven to be undeterred by his contractual and legal obligations to not interfere in West Shore's business relationships.  Therefore, injunctive relief is necessary and appropriate to keep him from continuing his misconduct.

104.    Chapman's actions were outrageous, taken with an evil motive or a reckless indifference to West Shore's contractual rights with third parties. Accordingly, exemplary damages are required to deter Chapman in the future.

105.    West Shore therefore seeks a judgment against Chapman for actual, compensatory, consequential, and exemplary damages, preliminary and permanent injunctive relief, prejudgment interest, all equitable relief compelling the return of West Shore's Confidential Information and Trade Secrets retained by Chapman after his termination, including any copies of such information, to West Shore, and such other relief as the Court deems just and proper.

## COUNT V
## Defamation

106.    West Shore realleges and incorporates into this count each and every allegation set forth above.

107.    Chapman made defamatory statements during his post-termination phone conversation with West Shore's business partner and competitor, Confidential Vendor 2.  In that conversation, Chapman falsely alleged that West Shore had copied a vendor's product design.

108.    Though Chapman's defamatory statement to Confidential Vendor 2 is false, it is a serious accusation of intellectual property theft, thereby falsely implicating West Shore in criminal activity and business misconduct, making the statement defamation *per se*.  Such allegations could cause West Shore significant reputational harm.

109.    Confidential Vendor 2 understood that Chapman's false allegation related to West Shore because shortly after this phone conversation, Confidential Vendor 2 announced to West Shore that it was raising its prices 5% across the board on its contract with West Shore.  On information and belief, this price increase only applies to Confidential Vendor 2's contract with West Shore, and not to its other business partners.

110.    Chapman has threatened to continue to defame West Shore unless West Shore pays him six months of severance pay.  Chapman will continue his misconduct

unless enjoined by this Court, and West Shore accordingly seeks injunctive relief to restrain Chapman from continuing to spread false and injurious allegations about West Shore to its business partners and competitors.

111.    Chapman has acted with malice and the intention to harm West Shore's business and its business reputation.  Punitive damages are appropriate here where Chapman must have the gravity of the wrong committed impressed upon him and be deterred from future misconduct.

112.    West Shore therefore seeks a judgment against Chapman for actual, compensatory, consequential, exemplary and punitive damages, preliminary and permanent injunctive relief, prejudgment interest, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, West Shore prays for relief as follows:

    a.    Expedited discovery, among other things, to assess the extent that Bryan Chapman possesses, and disclosed and misused, West Shore's confidential information and trade secrets, the extent to which Chapman has and/or continues to intentionally interfere with West Shore's contractual relationships, and the extent to which Chapman has and/or continues to defame West Shore, including an immediate

deposition of Chapman with leave to depose him again during the normal discovery period;

b.      Entry of judgment for West Shore against defendant Bryan Chapman on all of West Shore's claims for relief;

c.      An award of actual, compensatory, consequential, exemplary, and restitution damages against defendant in an amount according to proof at trial;

d.      An award of exemplary and punitive damages for defendant's willful, wanton, and malicious misappropriation of trade secrets and defamation;

e.      An injunction to prevent the theft, use, or disclosure of West Shore's trade secrets and confidential information and to enjoin Chapman from continuing to make defamatory statements about West Shore;

f.      All costs of suit herein including reasonable and necessary attorneys' fees;

g.      Pre- and post-judgment interest at the maximum legal rate; and

h.      Any other and further relief, at law and/or in equity, which the Court deems just and proper and to which West Shore is entitled.

## DEMAND FOR JURY TRIAL

West Shore hereby demands a trial by jury of all issues triable.

Dated: October 6, 2023                    Respectfully submitted,

By: */s/ Thomas G. Collins*
Thomas G. Collins (I.D. #75896)
Sara E. Myirski (I.D. #321113)
**BUCHANAN INGERSOLL & ROONEY PC**
409 North Second Street, Suite 500
Harrisburg, PA 17101
Tel: (717) 237-4800
Fax: (717) 233-0852
Email: thomas.collins@bipc.com
Email: sara.myirski@bipc.com

Ari N. Rothman (*pro hac vice forthcoming*)
**VENABLE LLP**
600 Massachusetts Avenue NW
Washington, District of Columbia 20001
Tel: (202) 344-4000
Fax: (202) 344-8300
Email: anrothman@venable.com

*Counsel for Plaintiff West Shore Home, LLC*

## **VERIFICATION**

I, Philip Brenckle, being older than 18 years of age, hereby declare that I am the Chief Financial Officer of West Shore Home, LLC, the plaintiff in the above-captioned litigation. I am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the complaint and know the contents thereof. I am informed and believe, and on that ground allege, that the matters stated in the foregoing document are true to the best of my knowledge.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on _October 6_, 2023, at _Mechanicsburg_, _Pennsylvania_
                                              (city)              (state)

Philip Brenckle

37